JoAnn BRYANT, Plaintiff,

v.

BETTER BUSINESS BUREAU OF
GREATER MARYLAND, INC. and
Philip Kershner, Defendants.

Civil No. AMD 95–970.

United States District Court,
D. Maryland.

April 4, 1996.

722

Beth Pepper, Stein & Schonfeld, Baltimore, Md.; Thomas J. Minton, John Thomas Ward, and Quinn, Ward & Kershaw, Baltimore, Md., for plaintiff.

Robert C. Morgan, Stacey E. Jackson and Mason, Ketterman & Morgan, Baltimore, Md., for defendants.

Karen Peltz Strauss and Marc P. Charmatz, Washington, D.C., for National Center for Law and Deafness and National Association of the Deaf Legal Defense Fund, amici curiae.

DAVIS, District Judge.

## CONTENTS

I.   Introduction ................................................... 727
II.   Brief of *Amici Curiae* ....................................... 727
III.   Summary Judgment Standards ................................. 728
IV.   The Facts ..................................................... 729
V.   Legal Analysis of an ADA Claim ............................... 732
    A.  The ADA Statutory Framework ............................ 732
    B.  Statutory Language, Legislative History and EEOC Regulations ............. 734
    C.  Burdens of Production and Proof ......................... 737
VI.   Legal and Factual Analysis of the Cross–Motions for Summary Judgment ........ 738
    A.  ADA Issues ............................................ 738
        1.  "Undue Hardship" .................................. 738
        2.  Nondiscriminatory Reason for Transfer ............... 741
        3.  Alternative Accommodations ......................... 741
        4.  Lack of Discriminatory Motive ....................... 742
        5.  *Prima Facie* Case .................................. 742
        6.  Plaintiff Not Entitled to Judgment as a Matter of Law ............... 742
    B.  Title VII .............................................. 744
    C.  Intentional Infliction of Emotional Distress ............... 746
        1.  Outrageousness of Conduct ......................... 746
        2.  Severity of Emotional Distress ...................... 748
    D.  Negligent Selection, Supervision and Retention ........... 750
VII.   Conclusion ................................................... 752

## I. Introduction

The Plaintiff, JoAnn Bryant, filed this action in the Circuit Court for Baltimore City, Maryland, on March 20, 1995. It was removed to this Court on March 31, 1995. 28 U.S.C. § 1441. In her complaint, the Plaintiff alleges that the Defendants, the Better Business Bureau of Greater Maryland, Inc., ("BBB") and its president, Philip Kershner, harassed and discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, and her disability (hearing loss) in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* In addition, she has filed claims for battery, intentional infliction of emotional distress, and negligent selection, supervision and retention.[1] This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Presently before the Court are cross-motions for partial summary judgment and a joint motion by the National Association for the Deaf ("NAD") and the National Center for Law and Deafness ("NCLD") for leave to file a brief *amici curiae* with respect to the

Plaintiff's disability discrimination claims. The Defendants oppose the latter motion.

For the reasons set forth below, the NAD's and NCLD's joint motion to file an *amici curiae* brief shall be granted. The Plaintiff's motion for partial summary judgment shall be denied. The Defendants' motion for partial summary judgment shall be granted with respect to the Plaintiff's sex discrimination claims based on disparate treatment, her intentional infliction of emotional distress claim, and her claims of negligent selection, supervision and retention. The Defendants' motion shall be denied, however, as to the Plaintiff's disability claims and her Title VII hostile work environment and retaliation claims.

## II. Brief of *Amici Curiae*

Traditionally, the role of *amici* has been to act as a friend of the court, providing guidance on questions of law. "At the trial level, where issues of fact as well as law predominate, the aid of *amicus curiae* may be less appropriate than at the appellate level where such participation has become standard procedure." *Yip v. Pagano*, 606

---

1. The law governing the Plaintiff's state claims is that of the forum state, Maryland. *See Erie Railroad v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

F.Supp. 1566, 1568 (D.N.J.1985), aff'd, 782 F.2d 1033 (3d Cir.), cert. denied, 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986). The decision to grant leave to proceed as amici at the trial court level is discretionary. Hoptowit v. Ray, 682 F.2d 1237, 1260 (9th Cir.1982); Waste Mgmt. v. York, 162 F.R.D. 34, 36 (M.D.Pa.1995) (collecting cases). The aid of amici curiae has been allowed at the trial level where they provide helpful analysis of the law, see, e.g., Waste Mgmt., 162 F.R.D. at 36, they have a special interest in the subject matter of the suit, Strasser v. Doorley, 432 F.2d 567, 569 (1st Cir.1970), or existing counsel is in need of assistance, United States v. Gotti, 755 F.Supp. 1157, 1158 (E.D.N.Y.1991); News & Sun–Sentinel Co. v. Cox, 700 F.Supp. 30, 32 (S.D.Fla.1988) (quoting Donovan v. Gillmor, 535 F.Supp. 154, 159 (N.D.Ohio), appeal dismissed, 708 F.2d 723 (6th Cir.1982)). A motion for leave to file an amicus curiae brief, however, should not be granted unless the court " 'deems the proffered information timely and useful,' " Yip, 606 F.Supp. at 1568 (quoting 3A C.J.S. Amicus Curiae § 3 (1973)).

The Defendants argue that NAD and NCLD have gone beyond the traditional role of amicus curiae, as friend of the court, to become "friends of the Plaintiff." See Leigh v. Engle, 535 F.Supp. 418, 422 (N.D.Ill.1982). In particular, they point to the fact that NAD's and NCLD's "brief provisionally filed is titled, in part, 'in Support of JoAnn Bryant....' " Dfs' Mem. of Law in Opp. to Mot. for Leave to file Brief Amici Curiae at 4. The Defendants also contend that the issues presented by the parties in their summary judgment motions have been adequately addressed without need for additional assistance from amici. Finally, according to the Defendants, NAD and NCLD "have no special interest in this litigation...." Id. Thus, they maintain that the motion for leave to file a brief amici curiae should be denied.

It is undoubtedly true that NAD and NCLD argue from a partisan position. It has been observed, however, that "by the nature of things an amicus is not normally impartial." Strasser, 432 F.2d at 569. Moreover, "there is no rule that amici must be totally disinterested." Funbus Sys., Inc.

v. California Pub. Util. Comm'n, 801 F.2d 1120, 1125 (9th Cir.1986); Hoptowit, 682 F.2d at 1260.

In the instant case, I am satisfied that "those aspects of [NAD's and NCLD's] brief which advocate [Plaintiff's] position [do not] so taint it as to outweigh its usefulness." Yip, 606 F.Supp. at 1568. I also recognize that NAD and NCLD both represent large constituencies of individuals which have a vested interest in how the provisions of the ADA are construed and applied. In addition, NAD and NCLD have not enlarged the issues presented by the parties, see Wyatt by and through Rawlins v. Hanan, 868 F.Supp. 1356, 1358–59 (M.D.Ala.1994), and I believe that the aid of NAD and NCLD can be useful in resolving the issues presented by the parties, see Harris v. Pernsley, 820 F.2d 592, 603 (3d Cir.) ("[P]ermitting persons to appear ... as friends of the court ... may be advisable where third parties can contribute to the court's understanding."), cert. denied sub nom., Castille v. Harris, 484 U.S. 947, 108 S.Ct. 336, 98 L.Ed.2d 363 (1987). Therefore, NAD's and NCLD's joint motion for leave to file a brief amici curiae shall be granted.

### III.   Summary Judgment Standards

Summary judgment may be granted if no genuine issues of material fact remain to be determined at trial. Fed.R.Civ.P. 56; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying [with specificity] those portions of [the opposing party's case] ... which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A genuine issue remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

When considering the motion, the court will view all facts and make all reasonable inferences in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–2514; *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 24, and *cert. denied,* —— U.S. ——, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994); *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Mere speculation by the non-moving party cannot stave off a properly supported motion for summary judgment. *See Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). In order to withstand the motion for summary judgment, the nonmoving party must produce sufficient evidence in the form of depositions, affidavits or other documentation which "demonstrate that a triable issue of fact exists" for trial. *Shaw,* 13 F.3d at 798. *See also Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; Fed.R.Civ.P. 56(e).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).

The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. and Indem. Co.,* 627 F.Supp. 170, 172 (D.Md.1985) (quoting Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* 2d § 2720 (2d ed. 1983)). *See also Federal Sav. and Loan Ins. Corp. v. Heidrick,* 774 F.Supp. 352, 356 (D.Md.1991). "[C]ross-motions for summary judgment do not automatically empower the court to dispense with the determination of whether questions of material fact exist." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 349 (7th Cir.), *cert. denied,* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). Both motions may be denied. *See Shook v. United States,* 713 F.2d 662, 665 (11th Cir.1983).

"[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil and Gas, Inc. v. Appleman,* 380 F.2d 323, 325 (10th Cir.1967). *See also McKenzie v. Sawyer,* 684 F.2d 62, 68 n. 3 (D.C.Cir.1982) ("neither party waives the right to a full trial on the merits by filing its own motion"). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook,* 713 F.2d at 665.

## IV. The Facts

Under either party's version of the facts, certain undisputed facts remain at the core. Those facts outline the framework within which this case arose and shall be set forth initially. Additional facts shall be discussed as deemed necessary.

BBB is a non-profit organization which provides information to consumers regarding Maryland businesses. In 1989, BBB's board of directors formed a search committee to hire a new president to run its organization. In August 1989, Philip Kershner was hired to fill that position.

In 1992, Plaintiff JoAnn Bryant was interviewed by Richard Hogan, BBB's Vice President of Operations, to fill the position of bookkeeper at BBB. During the interview, Hogan became aware that Bryant wore a hearing aid. She informed him that she had a hearing problem and that she read lips in order to understand what people say. Ho-

gan recommended Bryant to Kershner, who ultimately approved her hire.

Bryant began working as a bookkeeper at BBB in September 1992. Shortly after she began, BBB supplied her with a telephone amplification device to aid her hearing when she needed to speak on the phone.[2] At the time, this device was sufficient for her needs.

Approximately a year after Bryant began working at BBB, she wrote the following memorandum to Kershner:

> I have been subjected to abusive behavior from Richard "Ben" Hogan since Oct. 15, 1992. This has been in the form of shouting, threats, and making fun of my disability. I feel that his behavior is unjust.... I would hope that you can correct this very unpleasant situation, as it is beginning to effect [sic] my health and I am in no position to quit.

Bryant Mem. to Kershner dated Oct. 6, 1993. Kershner claims to have spoken with Hogan about Bryant's complaints at the time he received her memorandum. Kershner Dep. at 185–87. Hogan admitted to Kershner that he had raised his voice when talking to Bryant. *Id.* at 187. Kershner advised Hogan that such behavior was inappropriate. *Id.* at 188.

In May 1994, Bryant requested a transfer to another position at BBB—membership coordinator. Her request was granted, and she assumed her new position immediately. Part of her job responsibilities included staffing a hotline number. Soon after she became membership coordinator, Bryant advised Kershner that she was having difficulty fulfilling her phone duties, *i.e.,* the hotline number. She told him that the amplification device she had used as bookkeeper was inadequate for her new telephone responsibilities as membership coordinator. In particular, she was having difficulty hearing addresses and telephone numbers. In order to remedy her problem, Bryant asked Kershner to pro-

vide her with a text telephone or TTY system; the Defendants' failure or refusal to do so is a critical element of one of Bryant's ADA claims.

Essentially, a TTY system consists of a keyboard and monitor which are connected to the hearing impaired individual's telephone. When the hearing impaired individual needs to speak on the phone, a third party operator acts as an intermediary between the hearing impaired individual and the other party. In Maryland, this system is called the Maryland Relay System ("MRS"). The operator relays messages from the other party to the hearing impaired person by typing them onto the screen. The hearing impaired person replies either by typing back and having the operator relay the message orally to the other party or, if she is capable (as is the Plaintiff), the hearing impaired individual can speak directly to the other party. The third party operator can be reached in all fifty states, twenty-four hours a day, seven days a week at no charge to either party. *See generally* NAD's and NCLD's *Amici Curiae* Brief at 2–3, 4–8. The TTY device proposed by Bryant would have had a one-time cost of $279.00. Kershner Dep. at 160.

In June 1994, Bryant went to see Dr. Richard Goodwin, because she was experiencing daily bouts of diarrhea. During her visit, she told him about the disability harassment she felt she had been experiencing at work. Bryant Dep. at 163–64. According to Bryant, Goodwin advised her to either quit her job or to see a therapist. *Id.* at 164. As a result, she began to see a psychotherapist, Marcia A. Geser, at the end of July 1994. *Id.* at 194. She continues to see Geser on a one-to-one basis approximately every two weeks. *Id.*

On July 1, 1994, Bryant filed her first discrimination charge against BBB with the Maryland Human Relations Commission ("MHRC"),[3] alleging that BBB's employees

---

**2.** The device was a "volume-control handset" which amplifies the voice of the incoming caller. The volume can be adjusted by the listener.

**3.** The Maryland Human Relations Commission is authorized to investigate complaints of unlawful discrimination in the workplace. *See generally* Md.Code Ann., Art. 49B §§ 1–4, 9–18 (1957,

1994 Repl.Vol. & 1995 Supp.). Complaints filed with the MHRC are also presented to the Equal Employment Opportunity Commission ("EEOC") upon request of the charging party. 29 C.F.R. §§ 1601.13, 1601.80.

had been discriminating against her on the basis of her disability by shouting at her, threatening her and joking about her deafness. Moreover, she claimed that although she had brought these incidents to the attention of management, "the harassment persists." She cited several incidents in which she felt slighted. First, she described an incident where Ken Salabes, BBB's Sales Manager, had refused her request for assistance with her duties as membership coordinator although he had assisted the previous, non-disabled, membership coordinator. She also related an incident where an employee apparently was yelling at another employee, but stopped and said " 'Oh, you are not JoAnn.' " Finally, she accused Kershner of faking sign language when she was having difficulty understanding him.

Several days after filing her MHRC charge, Bryant sent a memorandum to the attention of Kershner and Hogan. Bryant Mem. to Kershner and Hogan dated July 6, 1994. In the memorandum, she explained that she was still having problems being effective on the phone as membership coordinator. *Id.* In particular, she said: "I cannot hear the questions, nor respond to people['s] needs. I'm sorry to sound like a broken record when it comes to my lack of hearing, but that's the way it is." *Id.* Kershner testified that he had received the memorandum, and that Bryant had spoken with him previously about her difficulties with the phone. Kershner Dep. at 213–14. Nevertheless, he remained "unsympathetic" because he had seen her on the phone with private calls a number of times. *Id.*

Finally, in early September 1994, Kershner informed Bryant that he and Hogan had considered her request for the TTY system and it was denied. A memorandum explaining the denial stated that:

Your suggestion to provide the Membership Coordinator's office with a telecommunications device would fundamentally alter the nature of the services provided by the accommodation and would impose an undue hardship on the operations of the Bureau.

Kershner Mem. to Bryant dated Sept. 8, 1994. The memorandum further indicated that Bryant was to be reassigned to the position of file coordinator in the complaint department. She was advised that this position would involve little or no telephone use and that her salary would not be adjusted due to the reassignment. *Id.* She began working as the file coordinator the following day.

A week later, Bryant filed another discrimination charge with MHRC. She alleged that the denial of the TTY system and her transfer constituted discrimination based on her disability. In addition, she claimed that during her meeting with Kershner on September 8, 1994, after he informed her of the denial and her pending transfer, Kershner had pulled her toward him and fondled her breast. She also alleged that she was replaced as membership coordinator by a non-disabled employee. Moreover, she claimed that her new position placed her in an area where the noise level would irritate her ears. In his written response to this charge, Kershner denied ever touching or making any advance toward Bryant. Kershner's Reply to Bryant's Sept. 16, 1994, MHRC Charge dated Nov. 7, 1994. He further alleged that when he confronted Bryant about the sexual harassment charge that she had stated: " 'I'll do whatever I have to do to keep my job.' " *Id.*

On the last day of November 1994 Bryant filed a third administrative discrimination charge against the Defendants with the MHRC. This time, she alleged that the Defendants had retaliated against her in violation of the ADA and Title VII in response to her earlier discrimination charges. As examples of retaliatory conduct she cited her transfer to file coordinator and the fact that her computer (as well as other business equipment) were taken from her office, although she needed a computer to fulfill the responsibilities of her new position.

Bryant filed her final administrative charge on January 13, 1995. The January 13th charge merely reiterated, mostly verbatim, her previously filed claims against the Defendants. On January 26, 1995, Bryant received a right-to-sue letter from the EEOC, 42 U.S.C. § 2000e–5(f)(1), and subsequently initiated this action.

After filing this action, in April 1995, Bryant began treating with Dr. Kathleen Tully, a medical doctor with a specialty in family practice, for her diarrhea. Tully diagnosed Bryant as having irritable bowel syndrome ("IBS"). Tully Dep. at 8. The basis for her diagnosis was that "for the year prior to [April 1995, Bryant] had had diarrhea on and off-and-on again basis, accompanied by abdominal cramping, that she had not had bleeding prior to that[, a]nd that she experienced her symptoms more intensely during periods of stress." *Id.* The cause of IBS, according to Tully, is "unknown." *Id.* at 9. She explained that "the condition is basically a constant. It is frequently aggravated by stressful situations...." *Id.* At the time she made this diagnosis, Bryant had told her that she was under great stress, but had not related any of the details. *Id.* Tully prescribed medication for her cramps, *id.*, but Bryant claims that they made her ill so she discontinued them on her own, Bryant Dep. at 195–96.

## V. Legal Analysis of an ADA Claim

In her complaint, the Plaintiff sets forth a number of theories under which she contends that the Defendants have discriminated against her on the basis of her disability. Pl.'s Compl. ¶¶ 29–30. The gravamen of the ADA claim is an allegation that by "refusing to make a reasonable accommodation to the known physical limitations of the Plaintiff, or even to investigate their feasibility, and denying Plaintiff employment opportunities because of the Plaintiff's need for reasonable accommodations," the Defendants discriminated against her on the basis of her disabili-

ty in violation of the ADA. *Id.* ¶ 30(h). Specifically, she alleges that the denial of her request for the TTY "to assist her in performing her duties as membership coordinator" effectively deprived her "of the opportunity to perform her job as the membership coordinator." *Id.* ¶ 12. The parties have focused on this claim in their cross-motions for summary judgment.[4]

### A. The ADA Statutory Framework

The Americans with Disabilities Act was enacted in 1990 with the express purpose "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities...." 42 U.S.C. § 12101(b)(2). *See also Myers v. Hose,* 50 F.3d 278, 281 (4th Cir.1995). In order to avoid confusion in implementing the ADA, it was intended that the body of law which had developed around § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.,* would provide guidance. The ADA

> codified much of the case law and the implementing regulations developed under the Rehabilitation Act. The overlap between the two statutes is substantial: indeed, the ADA specifies that administrative complaints filed under either statute be "dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards for the same requirements." 42 U.S.C. § 12117(b). ... Thus, ... the substantive standards for determining liability [under either act] are the same.

*Myers,* 50 F.3d at 281 (citations omitted). *See also Doe v. University of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1264 n. 9 (4th Cir.1995).[5]

---

**4.** Bryant also seems to allege a type of "hostile environment" disability claim and a retaliation claim under the ADA. These theories have not been briefed by the parties in connection with the cross-motions for summary judgment.

**5.** There do exist, however, certain substantive differences between the Rehabilitation Act and the Americans with Disabilities Act. Under the appropriate set of circumstances, these differences may warrant diverging from Rehabilitation Act precedent. *See generally* Barbara A. Lee, *Reasonable Accommodation Under the Americans with Disabilities Act: The Limitations of Rehabilitation Act Precedent,* 14 Berkeley J.Empl. & Lab.L. 201 (1993). For example, the Rehabilita-

tion Act states that it is a violation of the Act to discriminate against a disabled individual "solely by reason of her or his disability...." 29 U.S.C. § 794(a). The ADA contains no such language. This omission was clearly intentional and meant to have an impact on the manner in which the ADA is applied. The House Education & Labor Committee Report explains the omission as follows:

> The Committee recognizes that the phrasing of section 202 in this legislation differs from section 504 by virtue of the fact that the phrase "solely by reason of his or her handicap" has been deleted. The deletion of this phrase is supported by the experience of the executive

In order to prove her claim for discrimination based on denial of an accommodation, the Plaintiff must demonstrate that: (1) she is an "otherwise qualified individual with a disability," *i.e.*, able to perform the essential functions of the job in question with or without reasonable accommodation; and (2) if a reasonable accommodation is necessary, that the denial of the accommodation was made in a discriminatory fashion. *See Myers*, 50 F.3d at 281–82; *see also Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979); *Doe*, 50 F.3d at 1265; *Tyndall v. National Educ. Ctrs., Inc.*, 31 F.3d 209, 212–13 (4th Cir.1994); 42 U.S.C. §§ 12111(8)–(10), 12112; 29 C.F.R. §§ 1630.1–.9. This determination is to be made by the Court on a "case-by-case" basis. *See School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 1130–1131, 94 L.Ed.2d 307 (1987); *Champ v. Baltimore County*, 884 F.Supp. 991, 996 (D.Md.1995) (mem.). One defense available to an employer accused of discrimination for failure to provide a reasonable accommodation (and one asserted by the Defendants here), is proof that accommodating the employee would have caused the employer an "undue hardship." 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9; *Myers*, 50 F.3d at 282.

The Plaintiff bears the ultimate burden of proof on the issue of the reasonableness of an accommodation. *Tyndall*, 31 F.3d at 213; *Champ*, 884 F.Supp. at 995; *Carrozza v. Howard County*, 847 F.Supp. 365, 368 (D.Md.1994) (mem.), *aff'd*, 45 F.3d 425 (4th Cir.1995). Unfortunately, however, little else is entirely clear with respect to the allocation of the burden of production and the burden of proof generally, as to a claim of discrimination under the ADA or the Rehabilitation Act.[6] *See generally Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131 (2d Cir.1995); Jeffery O. Cooper, Note, *Overcoming Barriers to Employment: The Meaning of Reasonable Accommodation and Undue Hardship in the Americans with Disabilities Act*, 139 U.Pa.L.Rev. 1423, 1463–66 (1991).

Furthermore, judicial interpretations of the statutory terms "reasonable accommodation" and "undue hardship" are in discord. A number of courts treat "reasonable accommodation" and "undue hardship" as flip sides of the same coin, *i.e.*, an accommodation which is reasonable does not cause an undue hardship, and an accommodation which would cause an undue hardship would, by definition, be unreasonable. *See, e.g., Borkowski*, 63 F.3d at 138 ("[M]eeting the burden of nonpersuasion on the reasonableness of the accommodation and demonstrating that the accommodation imposes an undue hardship

---

agencies charged with implementing section 504.

\*   \*   \*   \*   \*   \*

A literal reliance on the phrase "solely by reason of his or her handicap" leads to absurd results. For example, assume that an employee is black and has a disability and that he needs a reasonable accommodation that, if provided, will enable him to perform the job for which he is applying. He is a qualified applicant. Nevertheless, the employer rejects the applicant because he is black and because he has a disability.

In this case, the employer did not refuse to hire the individual solely on the basis of his disability—the employer refused to hire him because of his disability and because he was black.... [I]t could be argued[, therefore,] *that he would not have a claim under section 504* because the failure to hire was not based solely on his disability and as a result he would not be entitled to a reasonable accommodation.

The Committee, by adopting the language used in regulations issued by the executive

agencies, rejects the result described above. Court cases interpreting section 504 have also rejected such reasoning. As the Tenth Circuit explained in *Pushkin v. Regents of University of Colorado*, 658 F.2d 1372 [10th Cir. (1981)], the fact that the covered entity lists a number of factors for the rejection, in addition to the disability, is not dispositive.

\*   \*   \*   \*   \*   \*

In sum, the existence of non-disability related factors in the rejection decision does not immunize employers. The entire selection procedure must be reviewed to determine if the disability was improperly considered.

H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 85–86 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 303, 368.

6. It was intended "that the burden of proof" with respect to reasonable accommodation and undue hardship "be construed in the same manner in which parallel agency provisions are construed under Section 504 of the Rehabilitation Act...." *See id.* at 72, 1990 U.S.C.C.A.N. at 354.

amount to the same thing."); *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1080 (6th Cir.1988) ("An accommodation is not reasonable ... if ... it imposes an undue hardship. ..."); *see also Mantolete v. Bolger*, 767 F.2d 1416, 1423–24 (9th Cir.1985) (placing initial and ultimate burdens on defendant/employer to prove its inability to accommodate); *Prewitt v. United States Postal Serv.*, 662 F.2d 292, 308 (5th Cir. Unit A Nov. 1981) (same). The Supreme Court suggested the same in *Arline* where it observed, *in dicta*, that an "[a]ccommodation is not reasonable if it ... imposes 'undue financial and administrative burdens'...." 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17.

Several courts have held, however, that an accommodation could be "reasonable" and still cause an "undue hardship." *See, e.g., Vande Zande v. Wisconsin Dept. of Admin.*, 44 F.3d 538, 542–43 (7th Cir.1995); *Barth v. Gelb*, 2 F.3d 1180, 1186–87 (D.C.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994). For these courts, the questions of reasonableness of the accommodation itself and its financial and administrative burdens on the employer are separate considerations.

The conflict demonstrated by these differing constructions makes it exceedingly difficult to analyze the present ADA claim where a proposed accommodation was denied, at least in part, because it allegedly would have caused the Defendants an undue hardship. Accordingly, in order for this Court to give proper consideration to the cross-motions for partial summary judgment presented by the parties in this case, it is necessary, as a threshold matter, to determine precisely what each party must prove and when they must prove it. This determination will also require the Court to divine the meanings of "reasonable accommodation" and "undue hardship."

B. Statutory Language, Legislative History and EEOC Regulations

▉ "Courts are charged with the duty to apply the law that Congress enacted. Accordingly, '[this Court] begin[s], as [it] must, by examining the statutory language, bearing in mind that [it] should give effect to the legislative will as expressed in the language.' " *Robinson v. Shell Oil Co.*, 70 F.3d 325, 328 (4th Cir.1995) (quoting *United States v. Murphy*, 35 F.3d 143, 145 (4th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995)). *See also Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978); *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 975 (4th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994). In addition, in construing the terms of the ADA, I shall consider as a persuasive aid the guidance provided by the EEOC regulations drafted pursuant to the ADA's statutory mandate. 42 U.S.C. § 12116; *see also* H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 82 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 364–65 ("The [EEOC's] regulations will have the force and effect of law."); *cf. Arline*, 480 U.S. at 279, 107 S.Ct. at 1126–1127 (in construing § 504 of the Rehabilitation Act of 1973, the regulations are of "substantial assistance"), and cases cited therein.

As set forth *supra*, the Plaintiff must first demonstrate that she is "qualified" within the meaning of the ADA for the membership coordinator position. Under the ADA, a qualified individual with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). *See also* 29 C.F.R. § 1630.2(m). The "essential functions" of a position are its "fundamental job duties" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). *See also id.* § 1630.2(n)(2)–(3); 42 U.S.C. § 12111(8).

Thus, a person may be qualified for a position even though she requires an accommodation to fulfill her job responsibilities. However, not *all* potential accommodations will permit a disabled individual to claim she is "qualified"; rather, the ADA requires that the accommodation involved be a "reasonable accommodation." 42 U.S.C. § 12111(9). The EEOC regulations explain that:

(1) The term *reasonable accommodation* means:

(i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

(2) *Reasonable accommodation* may include but is not limited to:

(i) Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

29 C.F.R. § 1630.2(*o*).

An employer violates the ADA when it discriminates "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Examples of discrimination within the meaning of the ADA include, *inter alia,*

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

\*     \*     \*     \*     \*     \*

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant. . . .

42 U.S.C. § 12112(b). *See also* 29 C.F.R. §§ 1630.4–.13.

An employer charged with discrimination for failure to make a reasonable accommodation under the ADA has several defenses available to it. The employer can attempt to demonstrate that: (1) the individual is not a "qualified individual with a disability," *i.e.,* not disabled within the meaning of the ADA or lacking the skills or knowledge to perform the essential functions of the job even with accommodation, 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); (2) the accommodation proposed is not a "reasonable accommodation," 42 U.S.C. § 12111(9); 29 C.F.R. § 1630.2(*o*); (3) a reasonable accommodation was offered to the employee, but she refused it and was unable to perform the essential functions of her job, 29 C.F.R. § 1630.9(d); or (4) although reasonable, the proposed accommodation would cause the employer an "undue hardship," 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9.

With respect to this final line of defense, "[t]he term 'undue hardship' means an action requiring [the employer to undertake a] significant difficulty or expense. . . ." 42 U.S.C. § 12111(10)(A). *See also* 29 C.F.R. § 1630.2(p). Determination of whether an accommodation would cause an employer an "undue hardship" is informed by consideration of a number of statutory and regulatory factors, including:

(i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

(ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

(iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

(iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

*Id.* *See also* 42 U.S.C. § 12111(10)(B).

■■■ In construing statutory language, it is presumed that the words of a statute were included for "a purpose." *Salomon Forex,* 8 F.3d at 975. The "use of different language creates the inference that Congress meant different things." *Moore v. Harris,* 623 F.2d 908, 914 (4th Cir.1980). Treating different statutory terms in the same statute similarly would "violate the 'well known maxim of statutory construction that all words and provisions of statutes are intended to have meaning and are to be given effect, and words of a statute are not to be construed as surplusage.'" *West Virginia Div. of the Izaak Walton League of America, Inc. v. Butz,* 522 F.2d 945, 948 (4th Cir.1975) (quoting *Wilderness Society v. Morton,* 479 F.2d 842, 859 (D.C.Cir.), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973)). *See also Ratzlaf v. United States,* 510 U.S. 135, ——, 114 S.Ct. 655, 659, 126 L.Ed.2d 615 (1994); *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 562, 110 S.Ct. 2126, 2132–2133, 109 L.Ed.2d 588 (1990). In addition, "[r]egulations, like statutes, are interpreted according to canons of construction. Chief among these canons is the mandate that 'constructions which render regulatory provisions superfluous are to be avoided.'" *Black & Decker Corp. v. C.I.R.,* 986 F.2d 60, 65 (4th Cir.1993) (quoting *Hart v. McLucas,* 535 F.2d 516, 519 (9th Cir.1976)). These principles of construction buttress my view that material differences exist between the inquiries which are attached to whether an accommodation is "reasonable" and whether that accommodation would, in effect, cause an excessive or "undue hardship" on an employer. For all these reasons, I conclude that these statutory terms are not flip sides of the same coin.

■■■ Accordingly, the "reasonable accommodation" question asks whether the accommodation: (1) would be "effective," *i.e.,* would it address the job-related difficulties presented by the employee's disability, 29 C.F.R. § 1630.2(*o*)(1)(i)–(ii); and (2) would allow the employee to attain an "equal" level of achievement, opportunity and participation, that a non-disabled individual in the same position would be able to achieve, *id.* § 1630.2(*o*)(1)(iii). This reading of the statute is supported by the legislative history of the ADA. In explaining the process for determining a reasonable accommodation, the House Report states:

[T]he reasonable accommodation requirement is best understood as a process in which barriers to a particular individual's equal employment opportunity are removed. The accommodation process focuses on the needs of a particular individual in relation to problems in performance of a particular job because of a physical or mental impairment.

\*     \*     \*     \*     \*     \*

Having identified one or more possible accommodations, the [next] step is to *assess the reasonableness of each in terms of effectiveness and equal opportunity.* A reasonable accommodation should be effective for the employee. Factors to be considered include the reliability of the accom-

modation and whether it can be provided in a timely manner.

... [A] reasonable accommodation should provide a meaningful equal employment opportunity. Meaningful equal employment opportunity means an opportunity to attain the same level of performance as is available to nondisabled employees having similar skills and abilities.

H.R.Rep. No. 489(II) at 65–66, 1990 U.S.C.C.A.N. at 347–49 (emphasis added).

▮ The "undue hardship" question, on the other hand, focuses on the impact which the accommodation would have, if implemented, on the specific employer in question "at a particular time." *See* 29 C.F.R. § 1630.15(d) (Appendix: Interpretative Guidelines) ("Whether a particular accommodation will impose an undue hardship for a particular employer is determined on a case by case basis."). This is a multi-faceted, fact-intensive inquiry, requiring consideration of: (1) financial cost, (2) additional administrative burden, (3) complexity of implementation, and (4) any negative impact which the accommodation may have on the operation of the employer's business, including the accommodation's effect on its workforce. *Id.* § 1630.2(p). The analysis is essentially one of balancing the benefits and the burdens of the proposed accommodation for a particular employer.

## C. Burdens of Production and Proof

The EEOC regulations provide that "[i]n general ... it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. § 1630.9, at 414 (Appendix: Interpretative Guidance). Once a need is established, "it may be necessary for the [employer] to initiate an informal, interactive process" with the disabled individual in order to "identify the precise limitations resulting from the disability and potential accommodations that could overcome those limitations." *Id.* § 1630.2(o)(3). "[T]he employer must make a reasonable effort to determine the appropriate accommodation." *Id.* § 1630.9, at 414 (Appendix: Interpretative Guidance). Of course, in some instances the proper accommodation will be so obvious that no fur-

ther inquiry is necessary. *See id.* In those circumstances where it is not so obvious, however, a four-step "flexible, interactive process that involves both the employer and the qualified individual with a disability" is advocated by the EEOC as follows:

(1) Analyze the particular job involved and determine its purpose and essential functions;

(2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;

(3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and

(4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

*Id.* In determining an appropriate accommodation, it may become necessary for an employer to seek additional technical assistance from any number of sources, including the EEOC, state and local agencies, "or from disability constituent organizations." *Id.* at 414–15. If several potential reasonable accommodations are identified, the employer may choose among them, giving consideration to the disabled employee's preference. *Id.* at 415. A hardship inquiry is, therefore, taken into account at this final stage, once the potential accommodations are identified.

▮ Bearing the above analysis in mind, I am persuaded that, with respect to the burdens of production and of proof regarding each of these issues, the Plaintiff must carry the initial burden to demonstrate a *prima facie* case with respect to the elements of her case, including "reasonable accommodation." By requiring the Plaintiff to demonstrate a *prima facie* case as a threshold matter, the Court can root out patently frivolous claims or fatally insubstantial claims. If the Plaintiff is successful at this stage, the burden

then shifts to the Defendants to offer credible evidence in rebuttal with respect to any of the elements of the Plaintiff's case. *See New York State Ass'n for Retarded Children, Inc. v. Carey,* 612 F.2d 644, 649 (2d Cir.1979) ("It is a general principle of discrimination law that once the plaintiff has established a *prima facie* case that he has been discriminated against, the defendant must present evidence to rebut the inference of illegality."). Shifting the burden of production to the employer at this stage prevents an employer from skirting its obligations under the ADA and its regulations to undertake an inquiry to find a reasonable accommodation before dismissing all possible accommodations as unreasonable or unduly burdensome. *See* 29 C.F.R. §§ 1630.2(*o*)(3), 1630.9 (Appendix: Interpretative Guidance).

■■■■■ If the Defendants successfully meet this burden, the ultimate burden of proof returns with respect to all of the elements of her case to the Plaintiff. "As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability." *White v. York Int'l Corp.,* 45 F.3d 357, 361 (10th Cir.1995). If the Plaintiff is successful in convincing the factfinder of the elements of her case by a preponderance of the evidence, the Defendants may then rely on proof that the particular accommodation rejected by them would have caused BBB an "undue hardship." *See* H.R.Rep. No. 485(III), 101st Cong., 2d Sess. 42 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 445, 464. The ultimate burden, as with all affirmative defenses, of proving an "undue hardship" remains at all times with the Defendants. *See Barth,* 2 F.3d at 1182.

## VI. Legal and Factual Analysis of the Cross–Motions for Summary Judgment

### A. ADA Issues

As set forth *supra,* the Plaintiff alleges that the Defendants' denial of the TTY system effectively deprived her of an opportunity to achieve equal employment status with BBB's nondisabled employees. She claims that the TTY system is both a "reasonable accommodation" and that it would not have caused BBB an "undue hardship." Defendants, on the other hand, argue that they are entitled to summary judgment on the issue of "undue hardship." They alternatively maintain several additional bases upon which summary judgment should be granted in their favor. Each basis shall be considered in turn.

### 1. "Undue Hardship"

■■■■■ The first basis upon which the Defendants suggest that summary judgment is appropriate is that the TTY would have caused BBB an "undue hardship." As described *supra,* at the time the Defendants advised the Plaintiff of their decision to deny her request for a TTY, she was given a memorandum from Kershner explaining that the denial was based on a determination that the TTY "would slow down the operation of" the membership coordinator, Kershner's Dep. at 160, and cause BBB an "undue hardship." Kershner Mem. to Bryant dated Sept. 8, 1994. According to Kershner, when he and Hogan made the decision to deny Bryant's request for a TTY, the reason they discussed was their prediction that the implementation of a 900–number, which was to take place in the following months, would result in an increase in the volume of calls the membership coordinator would receive. Kershner Dep. at 151–53, 236–37.[7]

At his deposition, Kershner admitted that in denying Bryant's request for the TTY, and choosing to transfer her instead, cost was not a factor. *Id.* at 160. Moreover, Kershner explained it was not the speed with which Bryant could handle the calls that was of concern, but that the concern was over Bryant's accuracy. *Id.* at 215. However, both Kershner and Hogan expressed concerns that indicate that speed was very much a factor. *See* Kershner Dep. at 157–58 ("it would slow down that membership coordina-

---

7. Apparently, the 900–number was going to be implemented as the main number for inquiries to BBB. As there was a fee associated with the use of the 900–number, BBB members could avoid the fee by contacting the membership coordinator directly instead of employing the 900–number. Kershner Dep. at 152–53.

tor's job"; "it would take two or three times the length of time to answer each call"); Hogan Dep. at 98 (concurring in Kershner's assessment that the TTY device would have slowed down Bryant to the point that she would have been unable to complete her other responsibilities), *id.* at 99 (stating that it would have slowed down Bryant's ability to complete her filing tasks). In any event, the Defendants argue that the denial was appropriate because, either way, it would have caused BBB an "undue hardship" to keep Bryant at the membership coordinator position.

The Defendants seek to shore up their "undue hardship" showing with the deposition testimony of their expert witness, Ms. Lianne F. Graham. Graham works as a consultant for Rehabilitation Experts of Maryland.[8] She testified that she agreed with the Defendants assessment that the TTY would have caused BBB an "undue hardship." As a basis for her opinion, she stated that from personal experience with the Maryland Relay System ("MRS") and TTYs in general, and with conversations with other individuals, TTYs and relay systems create a time lag. Graham Dep. at 60. In addition, she stated that BBB's members' awkwardness and unfamiliarity with the system would cause the members who called BBB an "undue hardship." *Id. See also* Hogan Dep. at 99 (stating that one reason for denying Bryant's request was that "[w]e believed that [BBB's members] had no idea of the use of the relay system"). As evidence of the time lag, Graham stated that she personally had experienced calls which had taken twice as long to otherwise complete. Graham Dep. at 73. Moreover, she maintained that there are times when the MRS will be busy and Bryant would have been unable to field a call altogether. *Id.* at 60–61.

Viewing the record favorably to the Plaintiff, I agree with the Plaintiff that the Defendants have failed to demonstrate that, as a matter of law, implementation of a TTY device in the membership coordinator position would have caused it an "undue hardship." In fact, the asserted grounds relied upon by the Defendants as demonstrating an "undue hardship" do not comport with those embodied in the statutory and regulatory scheme governing such claims. *See* 42 U.S.C. § 12111(10)(B); 29 C.F.R. § 1630.2(p). For example, the argument suggesting that the TTY would have slowed down Bryant to the point where she would have been unable to complete her other duties as membership coordinator actually has as its focus the "reasonableness" of the accommodation, not its burden on the employer. That is, the argument suggests that the TTY would not have allowed Bryant to attain the same level of achievement as a non-disabled person. Moreover, this argument fails to explicate the alleged negative effect any "slowing down" would have had on BBB. For instance, perhaps some of her non-essential functions could have been delegated to others. Furthermore, none of the witnesses have been able to state with any degree of particularity the volume of calls which Bryant received as membership coordinator or the number which the current coordinator is handling. *See* Kershner Dep. at 196, 215; Hogan Dep. at 88–89, 105. Nor has any witness been able to quantify what difference the 900–number has made on the volume of calls which the membership coordinator is receiving. *See, e.g.,* Kershner Dep. at 153–54. Thus, drawing all inferences in favor of the Plaintiff, I decline to credit the Defendants' suggestion that Bryant would have been unable to handle the flow of increased calls with the TTY after the 900–number

---

**8.** The Plaintiff suggests that Graham is not even qualified to render the opinions which she proffered at her deposition. Pl.'s Mem. of Law in Supp. of her Mot. for Part.Summ.J. and in Opp. to Dfs' Mot. for Part.Summ.J. at 24. Specifically, the Plaintiff points to the fact that

Graham last used the Maryland Relay System some five years ago before the current relay system went into effect. She has no knowledge about the number of calls JoAnn Bryant

was receiving as membership coordinator, or would receive, and has no knowledge of the specific duties of the membership coordinator. Ms. Graham has never been to the BBB offices and has no knowledge of the actual workload of the membership coordinator.

*Id.* Although I share some of the Plaintiff's concerns regarding this witness's qualifications, for purposes of this opinion only, I shall assume that Graham is qualified to testify.

went into effect when that number may be as small as one or two.[9]

In addition, defense arguments based on the imagined awkwardness and unfamiliarity of BBB's members with the relay system are not only inappropriate and patronizing, but offensive. First, there is no evidence in the record whatsoever that supports a finding that the system is awkward or that BBB's membership is unfamiliar with relay systems. Hogan Dep. at 100–01 (testifying that he did not speak directly with any members in making this determination). Second, even assuming that the system is awkward and unfamiliar, no suggestion has been made as to how this would have a negative impact on the operation of BBB. It has not been intimated by the Defendants that the unfamiliarity with the system would cause BBB to lose members or that the quality of services provided to them would be diminished. Moreover, the Defendants' assumption of an adverse impact is based on little more than preconceived discriminatory stereotypes, which are the targets of the ADA in the first place.

Furthermore, the busy signal and time delay arguments lack sufficient support in the record. First, there is no evidence in the record which quantifies the frequency of busy signals or the time delay incurred. Hogan Dep. at 153 (no knowledge of extra time a relay call takes). Moreover, with respect to Graham's testimony on busy signals, the Plaintiff correctly points out that this portion of Graham's testimony is based entirely on inadmissible hearsay; the basis for her opinion was a conversation with an unnamed MRS operator. Pl.'s Mem. of Law in Supp. of her Mot. for Part. Summ. J. and in Opp. to Dfs' Mot. for Part. Summ. J. at 24–25 & n. 71. Inadmissible hearsay generally cannot be used to support a motion for summary judgment, Charles Alan Wright, Arthur R.

Miller & Mary Kay Kane, *Federal Practice & Procedure: Civil 2d* § 2727, at 156 (2d ed. 1983), and certainly here there is no basis to credit this report as constituting the kind of hearsay customarily relied upon by experts. *Cf.* Fed.R.Evid. 703.

Finally, it has been noted in determining what constitutes an "undue hardship" in the context of a Title VII case on religious accommodation that "[u]ndue hardship means something greater than hardship. Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts." *Anderson v. General Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir.1978), *cert. denied sub nom., International Ass'n of Machinists and Aerospace Workers AFL–CIO v. Anderson*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). *See also Edwards v. School Bd. of Norton*, 483 F.Supp. 620, 627 (W.D.Va.1980) ("[M]any courts have expressed great skepticism about ' "hypothetical hardships" based on assumptions about accommodations which have never been put into practice.' ") (quoting *McDaniel v. Essex Int'l, Inc.*, 571 F.2d 338, 343 (6th Cir.1978)), *vacated and remanded in part on other grounds*, 658 F.2d 951 (4th Cir.1981). Under the regulations governing the administration of the ADA, an employer must "show substantially more difficulty or expense than would be needed to satisfy" the undue hardship requirement for religious accommodation.[10] 29 C.F.R. § 1630.15(d) (Appendix: Interpretative Guidance); *see also* H.R.Rep No. 485(II) at 68, 1990 U.S.C.C.A.N. at 350 ("a significantly higher standard"). Accordingly, "[t]he clear implication of the ADA's statutory and regulatory language with regard to ... undue hardship is that an employer will violate the ADA by rejecting ... a proposed accommodation without first conducting an analysis to

9. In addition, Kershner testified that members who called the 900–number could choose to have the call billed to their credit cards. Under the original plan, the credit card callers were to be sent to the membership coordinator. However, after implementation of the 900–number, it was determined that too many calls would be transferred to the membership coordinator and a new position, credit card operator, was created to handle the credit card calls. Kershner's Dep. at 163–65. BBB's ability to accommodate such an overflow of calls undercuts its argument that it would have been an "undue hardship" to accommodate Bryant in the event that the volume of calls would have been overwhelming.

10. The undue hardship showing required in religious accommodation cases is that the cost would be more than "de minimis" to the employer. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

determine whether the proposed accommodation is reasonable and whether it really presents an undue hardship." Barbara A. Lee, *Reasonable Accommodation Under the Americans with Disabilities Act: The Limitations of Rehabilitation Act Precedent,* 14 Berkeley J. Empl. & Lab. L. 201, 219 (1993). In order to withstand judicial scrutiny, "the employer's undue hardship defense will have to have a strong factual basis and be free of speculation or generalization about the nature of the individual's disability or the demands of a particular job." *Id.* at 250.

The record clearly demonstrates that neither Kershner nor Hogan undertook any genuine analysis of the TTY device. Kershner Dep. at 147–60 (he only discussed the decision with Hogan and Hogan told him it would slow her down); Hogan Dep. at 103 (in making his decision he did not consult with anyone or review any literature; he stated that he had read some literature regarding relay systems some two to four years prior); *id.* at 138 (he never used the MRS personally). Although they were not required to determine with mathematical certainty whether the TTY system would have caused BBB an "undue hardship," a decision lacking any substantial evidentiary basis whatsoever is clearly insufficient to support the Defendants' motion for partial summary judgment. In sum, the Defendants have failed to meet their burden with respect to the undue hardship defense.

### 2. Nondiscriminatory Reason for Transfer

Next, the Defendants suggest that the Plaintiff performed poorly during her tenure as membership coordinator. The Defendants argue that Bryant's poor performance was a non-discriminatory reason for denial of the accommodation. Therefore, the Defendants contend, the burden is on the Plaintiff to demonstrate that this reason is pretextual. Dfs' Opp. to Pl.'s Mot. for Summ. J. at 4–5 (citing *Butler v. Department of the Navy,* 595 F.Supp. 1063 (D.Md.1984). In *Butler,* the court relied on *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for the proposition that if an employer comes forth

with a legitimate, non-discriminatory reason against a charge of discrimination, the burden then shifts to the plaintiff to demonstrate pretext. *McDonnell Douglas* was a Title VII case, however, the Fourth Circuit has held that "at least in those circumstances where the defendant disavows any reliance on discriminatory reasons for its adverse employment action," the *McDonnell Douglas* proof scheme is applicable to ADA claims as well. *See Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 57–58 (4th Cir.1995).

Nonetheless, the Court will not entertain this argument as the Defendants' reason for denying the accommodation was, at least in part, based on the Plaintiff's disability as evidenced by the September 8th memorandum. *See White,* 45 F.3d at 361 n. 6; *Vazquez v. Bedsole,* 888 F.Supp. 727, 730 (E.D.N.C.1995); *see also supra* n. 5.

### 3. Alternative Accommodations

The Defendants also contend that they supplied the Plaintiff with two reasonable accommodations: a volume-controlled handset and a transfer to another job for which she was qualified. The ADA does not require an employer to provide the *best* accommodation. *See* 29 C.F.R. § 1630.9, at 415 (Appendix: Interpretive Guidance) ("[T]he employer ... has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation that is easier for it to provide."). Consequently, the Defendants argue here that they have fulfilled their obligation to the Plaintiff. Moreover, they contend that the Plaintiff's rejection of these "reasonable" accommodations relieves them of any further obligation to try to accommodate her. *See id.* § 1630.9(d).

These arguments can be dispensed with quickly. First, there simply is no evidence which supports a finding that Bryant was capable of performing her duties as membership coordinator with the volume-controlled handset alone. Rather, the evidence is to the contrary. Thus, that accommodation was *per se* unreasonable. *Id.* § 1630.2(*o*).

With respect to transferring her to a different position as a method of accommodation, it is clear from the statutes and the regulations that accommodation by transfer is to be considered as a last resort. Otherwise, there will be certain positions which disabled individuals may forever be barred from holding. The EEOC's "Interpretative Guidance on Title I of the Americans with Disabilities Act," states:

In general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship....

Reassignment may not be used to limit, segregate, or otherwise discriminate against employees with disabilities by forcing reassignments to undesirable positions....

29 C.F.R. § 1630.2(*o*), at 407–08. (Appendix: Interpretative Guidance). *See also* H.R.Rep. No. 485(II) at 63, 1990 U.S.C.C.A.N. at 345 ("Efforts should be made ... to accommodate an employee in the position that he or she was hired to fill before reassignment is considered."); Lawrence P. Postol & David D. Kadue, *An Employer's Guide to the Americans with Disabilities Act: From Job Qualifications to Reasonable Accommodations,* 24 J. Marshall L.Rev. 693, 717 (1991) (same). It cannot be concluded as a matter of law on this record that the Defendants' decision to transfer Bryant was a reasonable accommodation under the statute.

### 4. Lack of Discriminatory Motive

The Defendants also suggest that denial of the TTY device alone is insufficient to demonstrate discrimination. The Defendants point to Bryant's transfer to a position of equal pay as evidence of lack of a discriminatory motive. This argument must fail also, as the ADA specifically states that denial of a "reasonable accommodation" alone is discrimination. 42 U.S.C. § 12112(b)(5)(A) (discrimination is defined, *inter alia,* as "not making reasonable accommodations"). "An employer who fails to provide reasonable accommodation to the known physical or mental limitations of a qualified individual with a

disability commits unlawful discrimination unless the accommodation can be shown to impose an undue hardship." *Dutton v. Johnson County Bd. of County Comm'rs,* 859 F.Supp. 498, 506 (D.Kan.1994).

### 5. *Prima Facie* Case

Finally, the Defendants argue that the Plaintiff has failed to make out a *prima facie* case, that is, they contend that she has failed to prove that she is "a qualified individual with a disability." Construing the evidence in favor of the Plaintiff, however, the bulk of the evidence suggests that Bryant's only difficulties with her position as membership coordinator related to her ability to hear accurately people on the phone. As the Defendants' own expert testified, the relay system would have solved those problems. *See* Graham Dep. at 83. Moreover, any contention that she made other errors on the job which demonstrated her lack of "requisite skill" are severely undercut by the fact that (1) the September 8th memorandum failed to mention such problems to her when she was transferred to file coordinator, and (2) the transfer came approximately four months after she began her tenure as membership coordinator and after repeated requests by Bryant for a TTY device. At bottom, arguments concerning Bryant's abilities merely generate an issue of fact for trial.

In sum, the Defendants' motion for partial summary judgment with respect to Plaintiffs' ADA claim shall be denied. A rational juror could find by a preponderance of the evidence that Bryant has been the victim of disability discrimination, and that she has been injured thereby.

### 6. Plaintiff Not Entitled to Judgment as a Matter of Law

The Plaintiff has also moved for partial summary judgment on her ADA claim. In her motion for partial summary judgment, the Plaintiff argues that the Defendants have failed to meet their burden in proving that the TTY system would have caused BBB an "undue hardship."[11] Pl.'s Mem of Law in

---

11. Actually, the argument heading in Plaintiff's memorandum states: "Defendants Have Failed to Show That Plaintiff's Request for a TTY Was Not a Reasonable Accommodation." Neverthe-

Supp. of her Mot. for Part. Summ. J. and in Opp. to Dfs' Mot. for Part. Summ. J. at 20–27. As set forth *supra*, I largely agree and barring some now unforeseeable development, this defense will be unavailable to the Defendants at the trial of this case.[12] However, the Plaintiff argues further that she is entitled to a grant of summary judgment "[s]ince the defendants have no adequate or cognizable defense...." *Id.* at 27. Here, the Plaintiff is seriously mistaken. Absence of a defense alone to a claim of discrimination does not *per se* mandate judgment in favor of the Plaintiff. Rather, in order to succeed on her motion for partial summary judgment, the Plaintiff must affirmatively demonstrate the elements of her case, *i.e.*, that: (1) she is disabled within the meaning of the statute; (2) she was qualified to perform the essential functions of the position of membership coordinator with the TTY system; (3) the TTY system is a reasonable accommodation; (4) the Defendants were aware of her need for an accommodation; and (5) the Defendants refused to supply her with any reasonable accommodation. The Plaintiff's offer of proof at this stage, however, is insufficient to warrant granting her motion for partial summary judgment.

■ To be sure, there is no serious dispute that the Plaintiff is "disabled" within the meaning of the ADA. A hearing loss approaching deafness is "a physical or mental impairment that substantially limits one or more of [her] major life activities." 42 U.S.C. § 12102(2)(A). The regulations specifically state that "hearing" is one of the "life activities" that is contemplated by the statute. 29 C.F.R. § 1630.2(i). Moreover, there is no dispute that the Plaintiff's hearing loss is permanent and severe. *Id.* § 1630.2(j)(2).[13]

■ With respect to whether the Plaintiff was qualified to perform the essential functions of the membership coordinator position, Plaintiff contends that she was capable of adequately performing all of her responsibilities, except those related to telephonic communications. In particular, she testified on deposition that she had difficulty hearing high-pitched voices, addresses and phone numbers. Bryant Dep. at 167, 173–74. As a result, when she mailed things to people who had called in requests for information, they were often returned because they were addressed incorrectly. *Id.* at 167. Bryant argues that if she had access to a TTY system and the MRS, the telephone problems she experienced while acting as membership coordinator would have disappeared. In addition, she argues that the Defendants were well aware of her difficulties with the phone as membership coordinator, that she had made several requests for accommodation, that she provided information on the TTY when requested of her, and that her request was summarily denied without adequate investigation by the Defendants. Thus, according to the Plaintiff, she is qualified if only the Defendants would make the appropriate accommodation.

Hogan testified on deposition, however, that Bryant's failure to use her voice mail was the most important reason for denying her a TTY. Hogan Dep. at 100. He also testified that other reasons for her transfer to file coordinator were her attitude, her failure to complete her work and her rudeness. *Id.* at 102. Furthermore, Kershner testified that Bryant would not accept criti-

---

12. It is simply impossible to determine at this stage whether the Defendants' expert will be permitted to provide any testimony at trial that will permit the question of "undue hardship" to go to the jury. *See supra* n. 8.

13. Although on deposition Kershner seemed to harbor some doubt as to the Plaintiff's claimed inability to hear, Kershner's Dep. at 214, the simple fact that he saw the Plaintiff using the phone without evident difficulty is insufficient in and of itself to create an issue of material fact on this issue.

less, Plaintiff then proceeds to argue that the Defendants have not established the absence of a dispute of material fact as to the issue of "undue hardship." As explained *supra*, I conclude that these are distinct questions, involving distinct burdens. In any event, as set forth in text in this section and in note 12 *infra*, and for the same reason that I decline to rule that Plaintiff has established that as a matter of law no "undue hardship" defense is available to the Defendants, I also decline to rule as a matter of law that Plaintiff has established the Defendants' liability under the ADA, if indeed, this is the import of Plaintiff's motion for partial summary judgment.

cism and never accepted responsibility for her mistakes. Kershner Dep. at 228–29. In addition, he stated that he told Bryant that he was moving her to the file coordinator position because she was making too many errors. *Id.* at 203–04. In particular, Kershner noted that Bryant transferred calls from the membership hotline to the Inquiry Department on two separate occasions rather than handle the calls herself. Kershner Dep. at 195.

Drawing all reasonable inferences in their favor, as I must at this juncture, with respect to the Plaintiff's qualifications to continue to work as membership coordinator, the Defendants raise genuine issues of material fact, thus prohibiting summary judgment in favor of the Plaintiff as to her ADA claim. For example, although the Plaintiff claims that her inability to hear adequately was the reason for her transferring calls and not answering her voice mail, Bryant Dep. at 186, the Court cannot accept those reasons as true as a matter of law on summary judgment. Accordingly, the Plaintiff's motion for partial summary judgment shall also be denied.

### B.   Title VII

Prior to seeking relief for Title VII claims in the courts, a plaintiff is required to file an administrative charge with the MHRC and the EEOC. 42 U.S.C. § 2000e–5. The purpose of the administrative filing requirement is to encourage informal resolution of discrimination claims. 29 C.F.R. § 1601.24. Moreover, the administrative charge provides the agency with notice of what it is to investigate and respondents with formal notice of the alleged practices they are called upon to defend. *Id.* § 1601.12; *see also Powers v. Grinnell,* 915 F.2d 34, 37 (1st Cir.1990). If informal resolution attempts fail, a plaintiff may then file suit. A plaintiff's civil complaint in court is limited by the scope of the investigation which could reasonably have been anticipated to have grown out of the administrative charge. *Chisholm v. United States Postal Svc.,* 665 F.2d 482, 491 (4th Cir.1981); *EEOC v. General Elec. Co.,* 532 F.2d 359, 368–69 (4th Cir.1976).

In her September 16, 1994, administrative charge the Plaintiff claimed the following:

Issue(s) Failure to Accommodate/Sexual Harassment

I believe I was discriminated based upon my physical disability, Hearing Loss, and sex, female, because:

\*      \*      \*      \*      \*      \*

On 9/8/94, Mr. Kershner called me into his office [for a meeting].... At the close of our meeting, Mr. Kershner extended his hands to me as he wanted us to be friends and then he pulled me to him and fondled my breasts. I left the office shocked.

Bryant's MHRC Compl. dated Sept. 16, 1994. In her November 30, 1994, charge Bryant claimed that she had been retaliated against by the Defendants, *inter alia,* for filing the September 16th discrimination charge. No other mention of discrimination on the basis of sex was made in any of the Plaintiff's administrative charges.

In Count II of her complaint before this Court, the Plaintiff alleges discrimination based on sex. In contrast to her administrative charges, Bryant's complaint sets forth a string of events which underlie these claims:

18.   On numerous occasions, from April, 1994 through September, 1994, during the course of her employment, Mrs. Bryant was subjected to a pervasive course of disgusting sexual contact by Defendant Kershner.

19.   In May, 1994, near the end of a work day, Defendant Kershner cornered Mrs. Bryant in the hallway and tried to kiss her. Mrs. Bryant told him to stop and that he was making her a nervous wreck. Defendant Kershner ignored Mrs. Bryant's statements to stop; instead, Defendant Kershner took Mrs. Bryant by the hand into his office, closed his door, and proceeded to kiss her on the lips, fondle her breast and body, and put his hand up her dress to her crotch. Mrs. Bryant told Kershner repeatedly to stop and, when he wouldn't, she had to forcefully push him away.

20.   In August, 1994, Defendant Kershner entered Mrs. Bryant's office, leaned

over and put his hand up her skirt. On another occasion, also in August, Mrs. Bryant was sitting in Kershner's office when Kershner came up behind her and slid his hand down her dress and inside her bra. Shocked and humiliated, Mrs. Bryant jumped up and left his office.

21. On September 9, 1994, Kershner informed Mrs. Bryant that he was assigning her to the position of office file clerk. Mrs. Bryant was humiliated and complained that the noise in the file room would irritate her ears. In response, Defendant Kershner extended his hands to her saying he wanted to be friends, and then he pulled her to him and fondled her breasts. Upset and embarrassed, Mrs. Bryant left his office and went home.

22. Shortly after the September episode, Mrs. Bryant filed a sex harassment charge with the Maryland Human Relations Commission and the Equal Employment Opportunity Commission against the Better Business Bureau.

23. Since filing of the sex discrimination charge in September, 1994, Defendant Kershner has retaliated against Mrs. Bryant by: (a) maintaining her in a file clerk position which is substantially below her experience and skill level; (b) removing her computer; (c) depriving her of a telephone; (d) requiring that she file in a room where the noise irritates her ears; (e) using her office as a storage space; and (f) engaging in other similar acts meant to further demean and denigrate Mrs. Bryant.

Pl.'s Compl. ¶¶ 18–23.

The Defendants move for summary judgment on Count II, arguing that the Plaintiff has failed to exhaust her administrative remedies. In particular, the Defendants point out that, although Bryant filed several administrative charges alleging disability discrimination, only the alleged September 9, 1994, episode was ever reported to any administrative agency. Dfs' Mem. in Supp. of their Mot. for Part. Summ. J. at 15. Moreover,

[t]he Defendants submit that the law provides that they have the absolute right to be put on notice of all charges alleged against them.... [S]ince the Plaintiff has only alleged a single act of sexual harassment by Defendant Kershner ... in an administrative charge, the Defendants are entitled to summary judgment on all other allegations of sexual harassment alleged by the Plaintiff in this action.

*Id.*

■ I agree, however, with the Plaintiff that her sexual harassment claims before this Court need only be " 'like or reasonably related' to the allegations of the EEOC 'charge,' and ... grow out of such allegations." Pl.'s Mem. in of Law in Supp. of her Mot. for Part. Summ.J. and in Opp. to Dfs' Mot. for Part. Summ.J. at 28. The law in the Fourth Circuit is clear that "[a]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Chisholm*, 665 F.2d at 491. *See also Powers*, 915 F.2d at 38 ("An administrative charge is not a blueprint for the litigation to follow.") (collecting cases); *General Elec. Co.*, 532 F.2d at 368–69; *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466–67 (5th Cir.1970). Although it is unclear from the record to what extent the agency's investigation actually uncovered the allegations encompassed by the Plaintiff's civil complaint, "it is not the scope of the actual investigation pursued that determines what complaint may be filed, but what EEOC investigation could reasonably be expected to grow from the original complaint." *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 128 (7th Cir.1989). *See also Powers*, 915 F.2d at 39 n. 4.

In this case, the Plaintiff's September 16th administrative charge and her civil complaint both center on encounters with Defendant Kershner. All of the alleged events involve physical contact. Moreover, all of the alleged events took place at the offices of BBB. It is therefore abundantly clear that these claims are "like or reasonably related" to those contained in her administrative complaint with respect to sexual harassment. *Cf. General Elec. Co.*, 532 F.2d at 369 (finding

that claims are " 'like' or 'related' since both involve a common pattern of discrimination"). Moreover, in pursuing its inquiry into the September 8th incident, it would have been reasonably within the "scope" of the administrative agency's investigation to have thoroughly interviewed Bryant. One need not make too great a leap of faith or logic to envision the investigator asking her whether there had been any other times when Kershner touched her in a sexual way. Therefore, any claims predicated on sexual harassment or retaliation would fall within the purview of a reasonable investigation and, hence, those claims shall not be dismissed.

▪ In addition, however, the Defendants argue that the Plaintiff is maintaining separate claims of "sex discrimination" and "sexual harassment" in her civil complaint, and "[s]ince no claim of sex discrimination appears any where [sic] on any charges filed by the Plaintiff, the Defendants are entitled to summary judgment on that count." Dfs' Mem. in Supp. of their Mot. for Part. Summ.J. at 15. In this regard, although the complaint does not unambiguously assert a disparate treatment sex discrimination claim, I agree with the Defendants. There is no mention in the administrative charges that the Defendants discriminated against the Plaintiff in hiring, promotions, termination, or otherwise on the basis of sex. All of the allegations included in the Plaintiff's administrative charges focus on sexually harassing behavior and retaliation for filing her original sexual harassment complaint. It is unreasonable to assume that the mere mention of "sex" in the administrative charge will invoke an investigation into all possible bases of discrimination based on sex by the employer. *Cf. Dennis v. County of Fairfax*, 55 F.3d 151 (4th Cir.1995) (plaintiff's EEOC charge alleged disparate disciplinary treatment; held that he was foreclosed from pursuing any Title VII claims with respect to hiring, promotion, and training, for failure to exhaust administrative remedies); *Ritter v. Mount St. Mary's College*, 814 F.2d 986, 993 (4th Cir.) (where plaintiff's administrative charge only alleged a denial of tenure claim, plaintiff was procedurally barred from litigating under theories of systemic discrimination and disparate treatment), *cert. denied*, 484 U.S.

913, 108 S.Ct. 260, 98 L.Ed.2d 217 (1987); *Nicol v. Imagematrix, Inc.*, 767 F.Supp. 744, 752–54 & n. 2 (E.D.Va.1991). Thus, to the extent that the Plaintiff has alleged in her pleadings claims based on sex discrimination in the terms and conditions of her employment, *i.e.*, disparate treatment, the Defendants' motion shall be granted.

**C.  Intentional Infliction of Emotional Distress**

▪ In order to prove a cause of action for intentional infliction of emotional distress in Maryland, the Plaintiff must demonstrate the following:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

*Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611, 614 (1977). Recovery under this theory of liability has been severely limited in Maryland to the most extreme cases of uncivilized behavior. As explained by the Maryland Court of Appeals in *Figueiredo–Torres v. Nickel:* " 'In developing the tort of intentional infliction of emotional distress, whatever the relationship between the parties, recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.' " 321 Md. 642, 653, 584 A.2d 69, 75 (1991) (quoting *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 61, 502 A.2d 1057, 1065, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986)).

**1.  Outrageousness of Conduct**

▪ The Defendants claim that the Plaintiff has failed to make out a *prima facie* case of intentional infliction of emotional distress. First, the Defendants argue that the Plaintiff has failed to demonstrate that the alleged conduct is sufficiently extreme and outrageous as a matter of law to warrant liability in this case. In particular, the Defendants maintain that:

Plaintiff claims that Philip Kershner "fondled" her breasts, put his hand down her blouse, and put his hand up her skirt. While such allegations are disturbing, this jurisdiction requires a showing of particularly egregious conduct by the alleged harasser, and "garden variety" sexual harassment, therefore will not automatically give rise to a claim for intentional infliction of emotional distress.

Dfs' Mem. of Law in Opp. to Pls' Mot. for Summ.J. at 15. As support for their position, the Defendants direct this Court to the opinion of the Fourth Circuit in *Paroline v. Unisys Corp.*, 879 F.2d 100 (4th Cir.1989), vacated in part and rev'd in part on other grounds per curiam, 900 F.2d 27 (4th Cir. 1990) (en banc).

In *Paroline*, the plaintiff's supervisor, Moore, had made sexually suggestive remarks to her, and on one occasion he "started rubbing his hands on her back" at work. *Id.* at 103. The major event which spurred that lawsuit, however, was an occasion where Moore gave the plaintiff a ride home. During the course of the ride, Moore made sexually suggestive remarks, kissed her and "repeatedly tried to hold her hand." *Id.* Upon reaching her home, he grabbed her, began kissing her and rubbed his hands up and down her back. *Id.* On appeal, the Court of Appeals held that Moore's conduct "did not rise to the level of outrageousness required under the strict standards imposed by Virginia law." *Id.* at 112–13.

14. The Defendants also argue, incongruously, that the sexually harassing events alleged by Bryant, with the exception of the September 8, 1994, encounter should not be considered as to the state law claims, for failure to exhaust administrative remedies. *See* Dfs' Mem. in Supp. of their Mot. for Part.Summ.J. at 18 n. 1. As explained *supra*, I am satisfied that the other events alleged by the Plaintiff can be considered with respect to her Title VII hostile environment and retaliation claims because those events are reasonably encompassed by those charges. In any event, I am unaware of any authority that would support the proposition that failure to exhaust administrative remedies with respect to events which underlie a Title VII civil suit would prohibit consideration of those same events with respect to a pendent state tort cause of action.

In the instant case, Bryant has alleged, *inter alia*, that, against her will, Kershner kissed her on the lips, stared at her chest, made sexually suggestive remarks, hugged her, fondled her breasts, including sliding his hand inside her bra on more than one occasion, as well as sliding his hand under her skirt on several occasions, once touching her crotch. Pl.'s Compl. at 19–21; Bryant Dep. at 73–79, 112–38, 142.[14] Assuming Bryant's allegations are true, it is disingenuous at best (to put it charitably) for the Defendants to suggest that Kershner's conduct resembles Moore's conduct in *Paroline*. Furthermore, the other cases cited by the Defendants, *Miller v. Equitable Life Assurance Soc'y*, 181 Ill.App.3d 954, 130 Ill.Dec. 558, 537 N.E.2d 887 (1989), and *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190 (6th Cir.1986), are neither controlling nor on point.[15]

The Maryland Court of Appeals has explained that in order to meet the first element of the tort, the alleged conduct must be " 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Harris*, 281 Md. at 567, 380 A.2d at 615 (quoting Restatement (Second) on Torts § 46 cmt. d (1965)). In assessing whether the alleged conduct meets this high standard, "it should not be considered in a sterile setting, detached from the surroundings in which it occurred." *Id.* at 568, 380 A.2d at 615 (citation omitted). Moreover, "[i]n cases where the defendant is

In addition, the Defendants argue that the Plaintiff's failure to include these other events in her administrative charges seriously undermines the Plaintiff's credibility with respect to these events. *See* Dfs' Mem. of Law in Opp. to Pl.'s Mot. for Summ.J. at 15 n. 4. Issues of credibility, however, are not before the Court on summary judgment. *See Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir.1986); *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir.1979) (per curiam).

15. In *Miller*, the alleged conduct did not come close to the level of inappropriate physical contact alleged by the Plaintiff in the instant case. Moreover, in *Polk* the court expressly did not reach the issue of outrageousness of the conduct, holding instead that the plaintiff had made an insufficient showing of severe emotional distress. 801 F.2d at 196.

in a peculiar position to harass the plaintiff and cause emotional distress, his conduct will be carefully scrutinized by the courts." *Id.* at 569, 380 A.2d at 615. Abuse of a position of authority, real or apparent, may, therefore, lend itself to a determination that the conduct in question is sufficiently outrageous. *Figueiredo–Torres,* 321 Md. at 654, 584 A.2d at 75; *Harris,* 281 Md. at 569, 380 A.2d at 616 (citing Restatement (Second) of Torts § 46 cmt. e).

Manifestly, the conduct alleged by the Plaintiff here meets the first element of the tort. The suggestion that this conduct is "garden variety" sexual harassment, and therefore not sufficiently outrageous and extreme, is almost as outrageous as the alleged conduct itself. Of course, one can imagine (as the caselaw attests) that there are instances of sexual harassment which would not ordinarily meet this high standard. Nonetheless, there is something fundamentally different about conduct which involves penetrating the perimeter of a woman's clothing and touching areas of the female anatomy which are generally considered off-limits to anyone other than a consensual sexual partner or a physician. Especially when considered in light of the other alleged behavior, repeated efforts by the Plaintiff's superior at work to reach for and fondle the Plaintiff's breasts and crotch are certainly "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a 'civilized community.'" *Harris,* 281 Md. at 567, 380 A.2d at 615 (quoting Restatement (Second) on Torts § 46 cmt. d). *Cf. Curcio v. Chinn Enterprises, Inc.,* 887 F.Supp. 190, 194–95 (N.D.Ill.1995) (mem.) (conduct held sufficiently outrageous under Illinois law where plaintiffs' manager, in addition to verbal abuse, pulled female employees' hands to his crotch); *Pease v. Alford Photo Ind., Inc.,* 667 F.Supp. 1188 (W.D.Tenn.1987) (mem.) (conduct held sufficiently outrageous under Tennessee law where president of company that plaintiff was working for engaged in a "course of conduct [which] consisted of touching, rubbing, fondling, stroking of hair, neck, shoulders, buttocks, grabbing of the upper inner thigh and other parts of the bodies of female employees on the premises of the work place

during working hours," including placing his hand under the plaintiff's lab coat and fondling her breast); *Mains v. II Morrow, Inc.,* 128 Or.App. 625, 877 P.2d 88 (1994) (conduct held sufficiently outrageous where plaintiff's supervisor repeatedly harassed her both physically and verbally, including touching her breast in a harassing manner).

### 2. Severity of Emotional Distress

The Defendants also argue, however, that the Plaintiff has failed to establish that she has suffered the severe emotional response required for recovery by the fourth element of this tort. In particular, they contend that the Plaintiff has been able to continue working at BBB, as well as to start job-hunting for a new position. Her descriptions of her reactions to the alleged harassment, according to the Defendants, are insufficient to warrant recovery. Dfs' Mem. of Law in Opp. to Pl.'s Mot. for Summ.J. at 21 (quoting the Bryant's Dep. at 140). They contend that to prevail on this claim "the psychological distress must be so extreme that 'no reasonable [woman] could be expected to endure it.'" Dfs' Mem. in Supp. of their Mot. for Part.Summ.J. at 18 (quoting *Harris,* 281 Md. at 571, 380 A.2d at 616 (quoting Restatement (Second) of Torts § 46 cmt. j)).

In *Harris v. Jones,* the Maryland Court of Appeals explained that the fourth element of the tort "requires the plaintiff to show that he suffered a *severely* disabling emotional response to the defendant's conduct." 281 Md. at 570, 380 A.2d at 616. Quoting extensively from the Restatement, the court explained further as follows:

"Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the distress inflicted*

*is so severe that no reasonable man could be expected to endure it."*

*Id.* at 570–71, 380 A.2d at 616 (quoting Restatement (Second) of Torts § 46 cmt. j). *See also Caldor, Inc. v. Bowden,* 330 Md. 632, 642–45, 625 A.2d 959, 963–65 (1993); *B.N. v. K.K.,* 312 Md. 135, 148, 538 A.2d 1175, 1182 (1988).

In the present case, Bryant alleges that she feels demeaned, humiliated, "extreme mental anguish" and outrage. Pl.'s Compl. at ¶¶ 15, 17, 20, 21 & 27. On deposition, Bryant testified that after one incident where Kershner fondled her breast and put his hand up her dress to her crotch, she went home "upset, humiliated, embarrassed, felt dirty, and cried all evening." Bryant Dep. at 140. She also testified that she continues to feel stress at work due to "humiliation and embarrassment and having my self-respect and dignity stripped from me and so many people knowing about … what has happened or transpired between Kershner and I, and it is not a very healthy environment." *Id.* at 174. *See also id.* at 199–200. Finally, she stated that the actions of Hogan, Kershner and others at BBB have caused her stress and mental anguish. *Id.* at 199.

In connection with these events, Bryant sought out treatment from both physical and mental health specialists. In particular, she initially sought treatment from a medical doctor, Dr. Richard Goodwin, in June of 1994, because she was experiencing daily bouts of diarrhea. *Id.* at 163. According to Bryant, it was Goodwin's suggestion that she seek the aid of a therapist. *Id.* at 164. As a result she began therapy with therapist Marcia A. Geser.

Geser testified on deposition that Bryant had spoken to her about harassment at BBB in the beginning of 1995, at which time she noted that Bryant was "beginning to acquire symptoms diagnostically, diagnostic precursors of IBS [irritable bowel syndrome] and that she should see a doctor immediately … about IBS." Geser Dep. at 66. Furthermore, Geser stated that the anxiety factors which she had identified as causing Bryant's

IBS at the beginning of 1995 where fear of "losing her job and being pennyless [sic].… Not being able to be re-employed because of her hearing difficulties. An increasing understanding of her historical role and present feelings of being victimized, both because of the hearing problem and her sense of … just general vulnerability because of the hearing problem." *Id.* at 70. She also observed that Bryant was worried over the condition of her son who had his own neurological problems, and the fact that this lawsuit had begun. *Id.* Her diagnosis of Bryant's condition was that she was suffering from a chronic depressive disorder which is caused by both historical and present issues. *Id.* at 93–94. In addition, she stated that Bryant's diarrhea condition was impacting on her daily functioning: "[S]he is afraid she is going to have a diarrhea attack, so she doesn't go out as much. Social withdrawal, fearing she will [be] embarrassed by the IBS. Doesn't have the motivation to push to do some of the normal daily activities that she used to do…." *Id.* at 98.

Presumably following Geser's advice to seek out additional medical attention, Bryant began treatment with Dr. Kathleen Tully.[16] Tully diagnosed her as having IBS on April 6, 1995. Tully Dep. at 8. When Tully saw her again on April 27, 1995, Bryant advised her that she had been sexually harassed at BBB and was suing BBB while continuing to work there. *Id.* at 10. Furthermore, Bryant complained of "having disturbed sleep, depressed mood, decrease in concentration and memory. No prior instances, no family history." *Id.* Tully prescribed an antidepressant for her condition. *Id.* at 10, 33. Tully concluded that both the aggravation of the IBS and Bryant's depressed state as related on April 27th were the result of workplace sexual harassment. *Id.* at 18–19. Tully acknowledged that she was unable to discern whether Bryant's depression was situational or biochemical, however, she stated that she believed Bryant is reacting to her situation. *Id.* at 23–24.

**16.** The record is devoid of any explanation as to whether the Plaintiff had any additional treatment with Dr. Goodwin after Bryant's initial visit, or as to why she sought treatment with a different medical specialist.

The preceding paragraphs set forth the bulk of the Plaintiff's evidence with respect to her emotional distress. As a matter of law, it is insufficient. A discerning review of the Maryland appellate cases reveals that a more disabling emotional response is required for recovery under this tort. For instance, in *Caldor, Inc. v. Bowden* the plaintiff testified that he felt distressed and ashamed. 330 Md. at 642, 625 A.2d at 963. Moreover, he stated that as a result of his embarrassment arising from the incident which prompted his suit, he socialized less. *Id.* Nonetheless, he was able to keep up his performance at school and find another job. The court held that this sort of hurt was not severely disabling and, therefore, not compensable under this theory of liability. *Id.* at 643, 625 A.2d at 964–65. *See also, e.g., Harris,* 281 Md. at 572–73, 380 A.2d at 617; *Moniodis v. Cook,* 64 Md.App. 1, 15–16, 494 A.2d 212, 219 (plaintiffs testified that as a result of the defendant's conduct, they had become upset, increased smoking, lost sleep and broken out in hives; held insufficient to establish severe emotional distress), *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985).

▮ In the face of this authority, I must conclude that Bryant has failed to produce evidence sufficient to create a genuine dispute of material fact as to whether her emotional distress is so severe as to have disrupted her ability to function on a daily basis.[17] Although Geser testified that because of Bryant's IBS she was afraid to go out socially, Bryant gave no indication that it has interfered with her ability to attend work or to look for a new job. Bryant Dep. at 175–76. Nor is there any indication from the record that Bryant is having difficulty performing her current duties. Moreover, I do not find that the conduct involved was so outrageous as to warrant a finding of severity as a matter of law, *B.N.,* 312 Md. at 148, 538 A.2d at 1182. In sum, without more, Bryant's evidence on severity of injury is

lacking, and summary judgement shall be granted in favor of the Defendants on the intentional infliction of emotional distress claim.

### D. Negligent Selection, Supervision and Retention

▮ "To establish a cause of action in negligence, a plaintiff must prove the existence of a duty owed by a defendant to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Cramer v. Housing Opp. Comm'n of Montg. County,* 304 Md. 705, 712, 501 A.2d 35, 39 (1985) (citing cases). At common law, an employer owed its employees, *inter alia,* the following duties: "to provide a safe workplace; ... to provide a sufficient number of competent fellow employees; and ... to promulgate and enforce rules governing employee conduct for the purpose of enhancing safety." Prosser & Keeton on Torts § 80 at 569 (W. Keeton ed. 1984), quoted in *Hastings v. Mechalske,* 336 Md. 663, 677 n. 8, 650 A.2d 274, 281 n. 8 (1994). *See also Athas v. Hill,* 300 Md. 133, 139, 148, 476 A.2d 710, 713, 718 (1984) (employer owes its employees "duties to provide a safe place to work and to retain competent, nonviolent employees"); *accord Merchants' & Miners' Transp. Co. v. Maryland,* 108 Md. 564, 569, 70 A. 413, 415 (1908) (same); *Wonder v. B. & O.R.R. Co.,* 32 Md. 411, 417–18 (1870). In part, these duties translated into an employer's duty to its employees to exercise due care in the hiring, supervision and retention of its employees and agents. *Henley v. Prince George's County,* 305 Md. 320, 330–38, 503 A.2d 1333, 1338–43 (1986); *Cramer,* 304 Md. 705, 501 A.2d 35; *Evans v. Morsell,* 284 Md. 160, 395 A.2d 480 (1978); *Norfolk and Western R.R. Co. v. Hoover,* 79 Md. 253, 29 A. 994 (1894); *see also Bastian v. Laffin,* 54 Md.App. 703, 710, 460 A.2d 623, 627 (1983) (holding that a principal "must use reasonable diligence in selecting ... and su-

---

**17.** The Defendants also argued that the causal connection between their alleged conduct and the Plaintiff's condition had not been sufficiently established. Although I need not reach the issue in light of my determination that the Plaintiff has failed to prove severity of injury, I note that Geser testified that Bryant's condition was caused by a combination of present and historical events. Geser Dep. at 93–94. When asked whether she could discern if Bryant would still have a chronic depressive condition without her work related difficulties, Geser answered: "Nope. Can't, you can't tease it out. ... I can't say." *Id.* at 94–95.

pervising [its] agent's conduct"); Restatement (Second) of Torts § 317 (1965); Restatement (Second) of Agency § 213 (1958). "If [an employer] does not perform th[ese] dut[ies], and injury is occasioned by the negligence of an incompetent or careless servant, the master is responsible to the injured employe[e] ... for his own negligence in not discharging his own duty towards the injured servant." *Hoover*, 79 Md. at 262, 29 A. at 995.

█ In order to prove a cause of action for either negligent hiring, supervision or retention, the Plaintiff must establish that her injury was caused by the tortious conduct of a coworker, that the employer knew or should have known by the exercise of diligence and reasonable care that the coworker was capable of inflicting harm of some type, that the employer failed to use proper care in selecting, supervising or retaining that employee, and that the employer's breach of its duty was the proximate cause of the Plaintiff's injuries. *See Evans*, 284 Md. at 165, 395 A.2d at 483 (quoting *Hoover*, 79 Md. at 262, 29 A. at 995); *see also McCall's Ferry Power Co. v. Price*, 108 Md. 96, 103, 69 A. 832, 834 (1908).

Bryant alleges that BBB failed to use reasonable care in executing its responsibilities with respect to the hiring, supervision and retention of its managers and supervisors. Pl.'s Compl. ¶ 40–42. In particular, she alleges that BBB "knew or should have known of Defendant Kershner's present and past pattern of harassment and those of the other managers over whom Kershner had responsibility. Reasonable employers would [have] take[n] steps to stop Kershner's conduct and that of the other employees." *Id.* ¶ 40. According to Bryant, it was BBB's negligence in this regard which allowed her to be "subject[ed] to daily and ongoing abuse [and] discrimination." *Id.* ¶ 42.

█ Bryant may not, however, pursue negligent selection, supervision and retention claims based on the alleged verbal abuse she suffered. As discussed above, negligent selection, supervision and retention claims are based on the common law. Bryant's disability and sex discrimination claims are based on federal statutes—Title VII and the ADA. Such claims were not actionable at common law in Maryland. Therefore, this Court may "not impose liability on employers for failing to prevent a harm that is not a cognizable injury under the common law." *Hays v. Patton–Tully Transp. Co.*, 844 F.Supp. 1221, 1223 (W.D.Tenn.1993).[18]

█ Count III of the Plaintiff's complaint, however, alleges battery. Thus, Bryant's negligent selection, supervision and retention claims can be pursued under a theory that the employer was negligent in its actions, thus allowing the battery to occur. *Id.* In order to survive summary judgment, therefore, the Plaintiff must demonstrate that BBB had or should have had knowledge of Kershner's conduct or general character which would have caused a prudent employer in these circumstances to have taken action. *See Cramer*, 304 Md. at 713, 501 A.2d at 39; *Baltimore Elevator Co. v. Neal*, 65 Md. 438, 455, 5 A. 338, 342 (1886).

█ With respect to the negligent selection claim, "there is a rebuttable presumption that an employer uses due care in hiring an employee." *Evans*, 284 Md. at 165, 395 A.2d at 483 (citing *Hoover*, 79 Md. 253, 29 A. 994). Nonetheless, Bryant alleges that BBB failed to make any inquiries into Kershner's background before hiring him, and she suggests that if it had, it would have discovered that two female workers at Kershner's prior job alleged having been sexually harassed by him. Pl.'s Mem. of Law in Supp. of her Mot. for Part.Summ.J. and in Opp. to Dfs' Mot. for Part.Summ.J. at 5 & nn. 7–9; Roscoe Aff'd; Brown Aff'd. Bryant fails to demonstrate, however, with sufficient specificity how BBB

18. Besides, in an action against an employer based on sexual harassment discrimination by one of its employees, the employer's negligent response to the alleged misconduct is a sufficient basis upon which to impose liability upon the employer. *See, e.g., McWilliams v. Fairfax Bd. of Sup'rs*, 72 F.3d 1191, 1195 (4th Cir.1996); *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1130–32 (4th Cir.1995); *Swentek v. USAIR, Inc.*, 830 F.2d 552, 558 (4th Cir.1987). Thus, this claim is wholly redundant.

would have become aware of this information.[19] Moreover, BBB has presented this Court with an affidavit from an employee at Kershner's prior employer which states that Kershner's personnel file contains "no negative reports, criticisms, evaluations, etc., which would have caused [the employer] to ever give Philip Kershner a negative reference." Lauer Aff'd ¶ 3. *See also id.* ¶ 4 (human resources department at corporate headquarters also has no negative information regarding Kershner). Thus, Plaintiff has failed to demonstrate that BBB knew or should have known that Kershner was potentially dangerous, *i.e.,* that he posed an unreasonable risk to female subordinates at the time it hired him. *See Evans,* 284 Md. at 165–68, 395 A.2d at 483–85.[20]

■ As for the Plaintiff's claims of negligent supervision and retention, there is no evidence that BBB knew or should have known about Kershner's alleged batteries until the filing of the September 16, 1994, administrative charge. As there are no allegations that any battery occurred after that date, there is no way that BBB's conduct could have prevented the alleged injury. In sum, even assuming that BBB was negligent in some way, its negligence was not the proximate cause of the Plaintiff's injury. *See Cramer,* 304 Md. at 713, 501 A.2d at 39 ("negligence is actionable only if it is a proximate cause of damage"). Accordingly, the Defendants' motion for partial summary judgment on Bryant's claims for negligent

selection, supervision and retention shall be granted.

## VII. Conclusion

For the reasons set forth, the NAD's and NCLD's joint motion to file an *amici curiae* brief shall be granted. The Plaintiff's motion for partial summary judgment shall be denied. Finally, the Defendants' motion for partial summary judgment shall be granted with respect to the Plaintiff's disparate treatment sex discrimination claim, her intentional infliction of emotional distress claim, and her claims of negligent selection, supervision and retention. The Defendants' motion shall be denied, however, as to the Plaintiff's disability claims and her Title VII hostile work environment and retaliation claims. A separate order shall be entered herewith.

## ORDER

In accordance with the foregoing Opinion, it is this 4th day of April 1996, by the United States District for the District of Maryland,

1) ORDERED that the joint motion of the National Association for the Deaf and the National Center for Law and Deafness for leave to file a brief *amici curiae* BE, and hereby IS, GRANTED;

2) ORDERED that the Defendants' Motion for Partial Summary Judgment BE, and hereby IS, GRANTED IN PART AND DENIED IN PART;

19. Bryant suggested in a footnote that Kershner's old boss would have given a negative reference about Kershner if he had been called and that he will testify as such at trial. Pl.'s Mem. of Law in Supp. of her Mot. for Part.Summ.J. and in Opp. to Dfs' Mot. for Part.Summ.J. at 5 n. 10. On motion for summary judgment, however, the nonmoving party does not have the right to withhold evidence until trial unless she provides an affidavit in accordance with Federal Rule of Civil Procedure 56(f) explaining why she cannot supply supporting documentation. Bryant has made no such showing; rather, the Plaintiff's proffer is inadmissible hearsay and cannot support her effort to withstand the Defendants' motion for partial summary judgment.

20. In addition, the affidavits of the women alleging that Kershner sexually harassed them describe events of a different nature than that al-

leged in the instant case. Roscoe Aff'd ¶ 4 (Kershner tried to kiss her on the lips); Brown Aff'd ¶¶ 3–6 (Kershner would sit close to her, rub her arm, place his hand on her thigh, order her to stand with her back against the wall, make references regarding her physical appearance, and grabbed her shoulders and tried to kiss her). Therefore, it is doubtful that a rational juror could reasonably conclude that had BBB even been made aware of these allegations that BBB was negligent in hiring Kershner. *See Evans,* 284 Md. at 167 n. 4, 395 A.2d at 484 n. 4 ("[E]ven where the employer knows of a criminal record and still hires the employee, this does not automatically make out a *prima facie* case of negligent hiring. Instead, it depends upon the nature of the criminal record and the surrounding circumstances.").

3) ORDERED that Plaintiff's Motion for Partial Summary Judgment BE, and hereby IS, DENIED.